**Gail ROGERS and Robert Rogers, Plaintiffs,**

v.

**FORD MOTOR COMPANY, Bendix Safety Restraints, Inc., and AlliedSignal, Inc., Defendants.**

No. 3:94cv819 AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Jan. 21, 1997.

Patrick F. O'Leary, Goshen, IN, for Gail Rogers and Robert Rogers.

Albert J. Dahm, Baker & Daniels, Fort Wayne, IN, Amy L. Mader, Baker and Daniels, South Bend, IN, for Ford Motor Co.

Eric A. Riegner, Lloyd H. Milliken, Locke Reynolds Boyd and Weisell, Indianapolis, IN, for Bendix Safety Restraints, Inc. and Allied Signal, Inc.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

By order of May 16, 1996, this court denied the plaintiffs' motion for partial summary judgment as to the issue of defective design, finding that application of the principles of collateral estoppel was inappropriate given the particular circumstances of the case. Additionally, the court granted the defendants' joint motion for partial summary judgment on the issue of punitive damages and denied defendants AlliedSignal and Bendix's motion for complete summary judgment based on the common law "contractor's defense."

Thereafter, defendants Bendix and AlliedSignal (collectively "AlliedSignal")[1] and Ford Motor Company ("Ford") jointly moved for leave to file another motion for complete summary judgment, stating that they had not been given access to the plaintiffs' sole expert witness until two and a half months after the dispositive motion deadline. In an order dated July 23, 1996, this court granted the defendants' motion and continued the scheduled trial pending resolution of the motion for summary judgment. Because the defendants filed and served their proposed summary judgment motion and brief in support thereof as exhibits to their motion requesting leave to file the same, the court gave the plaintiffs fifteen days after the date of its order in which to file their response. After the court granted the plaintiffs two extensions of time in which to file their response (the latter of which extended the date to August 26, 1996), the Rogers belatedly filed their response on September 5, 1996.

In addition to the defendants' motion for summary judgment, the plaintiffs and defendants have jointly and independently filed a variety of other motions in this cause of action. It is the court's intention to deal at this time with all motions currently pending in this matter. Jurisdiction is conveyed on the court by diversity of citizenship pursuant to 28 U.S.C. § 1332.

## I. BACKGROUND

Plaintiff Gail Rogers was injured in an automobile accident on November 11, 1992, when the vehicle in which she was riding sustained a driver's side impact in a collision with another vehicle. She was a front-seat passenger in a 1988 Lincoln Town Car operated by her husband, plaintiff Robert Rogers. The Rogers's vehicle was manufactured by defendant Ford and contained seat belt assemblies manufactured by defendant AlliedSignal.

The plaintiffs claim that Gail Rogers sustained enhanced bodily injuries when the seat belt in the Rogers's vehicle inadvertently released during the accident, allowing Mrs. Rogers to strike the dashboard and windshield. Specifically, the plaintiffs contend that the seat belt assembly in their Lincoln Town Car was vulnerable to "inertial actuation," an engineering phenomenon which theoretically can occur when the housing of the seat belt buckle is abruptly accelerated from the back side while the spring-loaded seat belt button and attached portions of the latching mechanism remain momentarily at

---

1. Although the plaintiffs' suit names as defendants both "Bendix Safety Restraints, Inc.," and "AlliedSignal, Inc.," the court understands Bendix Safety Restraints to be merely an operating division of AlliedSignal, Inc., and not an independent corporate entity. Accordingly, the court will refer to these defendants collectively as AlliedSignal.

rest relative to the housing of the buckle, thereby simulating the ordinary depression of the button.[2] The plaintiffs' complaint seeks compensatory damages for Mrs. Rogers's injuries and Mr. Rogers's loss of consortium.

## II. DISCUSSION

Plaintiffs Gail and Robert Rogers claim that the defendants are strictly liable under Indiana law for their failure to design a seat belt that was not subject to the phenomenon of inertial actuation. In addition to their theory of strict liability, the plaintiffs contend that the defendants also are liable under a theory of common law negligence for their failure to conduct reasonable tests to discover the alleged defects and to undertake a recall campaign prior to the date of the Rogers's accident—i.e., for failure to warn the plaintiffs of the latent dangers in their Lincoln Town Car's seat belts.

With respect to the strict liability theory, the plaintiffs maintain that the seat belt failed to provide Gail Rogers with reasonable protection in the specific circumstances surrounding the accident, and that a feasible, more practicable design would have afforded better protection. AlliedSignal and Ford move for summary judgment on the grounds that (a) the plaintiffs' sole design defect expert is not qualified to testify under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and his proposed testimony is neither relevant nor based on scientifically reliable methodologies pursuant to the mandates of *Daubert;* and (b) even assuming, *arguendo,* that the testimony of the plaintiffs' expert were admissible, the plaintiffs cannot meet their burden of proving that a feasible, more practicable design would have afforded better protection.

### A. Defendants' Motions to Strike Plaintiffs' Response and Exhibits

As a preliminary matter, AlliedSignal moves the court to strike the plaintiffs' re-

sponse to the motion for summary judgment on the grounds that (1) it is untimely; (2) it fails to include a "Statement of Genuine Issues" as required by this court's local rules; and (3) it is not supported by any admissible evidence. Ford moves separately to strike the plaintiffs' response on the ground that it is untimely. Ford also moves the court to strike the exhibits attached to the plaintiffs' response on the ground that they are inadmissible hearsay.

▪ In support of its argument to strike the plaintiffs' response, Ford suggests that the court forewarned the plaintiffs in its order of May 16, 1996, that failure to respond to a motion for summary judgment is "fatal." However, the defendant overlooks the context of the court's remark, which dealt with the consequences of a *complete* failure to file—not a *delayed* filing. *Rogers v. Ford Motor Co.*, 925 F.Supp. 1413, 1422–23 (N.D.Ind.1996); *see* N.D.IND.R. 56.1. Moreover, it is well established that the decision whether to apply local rules strictly or to overlook such transgressions is a matter left to the sound discretion of the district court. *Waldridge v. American Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir.1994). The same rule applies to AlliedSignal's argument that failure to include a "Statement of Genuine Issues" requires the court to strike the plaintiffs' response.

▪ Finally, in support of its motion to strike, AlliedSignal argues that the plaintiffs' response is not supported by admissible evidence; Ford moves separately to strike the plaintiffs' exhibits on the same ground. The court notes that the attachments to the plaintiffs' response consist of a letter purportedly written by a representative of Ford and mailed to a director of the National Highway Traffic Safety Administration and an internal memorandum allegedly prepared by Ford's Restraints Engineering Department.

▪ It is well established that materials submitted for summary judgment must be

---

**2.** Theoretically, the same effect could be produced by rapidly accelerating the seat belt housing from the front side and then abruptly decelerating the housing, thereby causing the button

and attached portions of the latching mechanism to momentarily continue their downward path relative to the seat belt housing.

otherwise admissible. *See Whitted v. General Motors Corp.,* 58 F.3d 1200, 1204 (7th Cir.1995). Rule 56(e) expressly states:

> ... [O]pposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

FED.R.CIV.P. 56(e). In the present cause, neither document submitted by the plaintiffs and attached to their response has been authenticated by affidavit or otherwise verified. Accordingly, Ford's motion to strike the exhibits attached to the response will be granted. AlliedSignal and Ford's motions to strike the plaintiffs' response will be denied.

 However, the court's decision to strike the exhibits to the plaintiffs' response in no way renders inadmissible expert testimony based upon the information contained in those documents. "Under Rule 703 [of the Federal Rules of Evidence], expert opinion evidence is not objectionable even though the expert has relied upon underlying information which is itself inadmissible, as long as the inadmissible information is of a kind 'reasonably relied upon by experts in the field.'" [3] *Cummins v. Lyle Indus.,* 93 F.3d 362, 371–72 (7th Cir.1996) (quoting Rule 703).

## B. Summary Judgment Standard

Summary judgment is proper if the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56; *L.S. Heath & Son, Inc. v. AT & T Info. Sys., Inc.,* 9 F.3d 561, 566 (7th Cir.1993). The initial burden is on the moving party to demonstrate, with or without supporting affidavits, the absence of a genuine issue of material fact and that judgment as a matter of law should be granted in that party's favor. *Celotex Corp. v.*

*Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). "A fact is material for purposes of summary judgment only if it might effect the outcome of a case under governing law." *JPM, Inc. v. John Deere Indus. Equip. Co.,* 94 F.3d 270, 273 (7th Cir.1996); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Once the moving party has met its initial burden, the opposing party must "go beyond the pleadings and ... designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553 (quoting Rule 56). The nonmoving party may not rest on its pleadings or on mere conclusory allegations to avoid summary judgment; rather, the party opposing summary judgment must come forward with evidence to show the existence of each element of its case on which it will bear the burden of proof at trial. *Matney v. County of Kenosha,* 86 F.3d 692, 695 (7th Cir.1996); *see Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552; *First Commodity Traders, Inc. v. Heinold Commodities, Inc.,* 766 F.2d 1007, 1011 (7th Cir.1985). There is no requirement under Rule 56 that the moving party negate his opponent's claim on matters where the nonmoving party bears the burden of proof. *Fitzpatrick v. Catholic Bishop of Chicago,* 916 F.2d 1254, 1256 (7th Cir.1990); *see also Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553.

Summary judgment motions must be analyzed under the standard of proof relevant to the case or issue. *Anderson,* 477 U.S. at 252–55, 106 S.Ct. at 2512–14. The district court is required to construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Matney,* 86 F.3d at 695; *Brennan v. Daley,* 929 F.2d 346, 348 (7th Cir.1991). The operative inquiry is whether, based upon all the documents submitted, a reasonable trier of fact could find by a preponderance of the evidence that the moving party is entitled to a verdict. *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. If no reasonable jury could find in favor of the party opposing the mo-

---

**3.** Although federal courts exercising diversity jurisdiction apply state law to substantive issues, the admissibility of expert testimony in diversity suits is governed by the Federal Rules of Evidence. *Stutzman v. CRST, Inc.,* 997 F.2d 291, 295 (7th Cir.1993).

tion, the court must grant summary judgment. *Matney*, 86 F.3d at 695; *see also Marozsan v. United States*, 90 F.3d 1284, 1290 (7th Cir.1996) ("Summary judgment is appropriate when there is only one logical conclusion the factfinder can reach.").

### C. Strict Liability

■ The plaintiffs' strict liability claim is governed by Indiana's Strict Product Liability Act, which imposes strict liability on one who places into the stream of commerce any product in a defective condition unreasonably dangerous to any reasonably foreseeable user or consumer. IND.CODE § 33–1–1.5–3(a) (1988). The Act applies only to product liability actions based on strict liability and not to actions grounded in theories of negligence. *Reed v. Central Soya Co., Inc.*, 621 N.E.2d 1069, 1070 n. 1 (Ind.1993).

Under Indiana's version of strict product liability law, a plaintiff must show the following *prima facie* elements to prevail: (1) the product was defective and unreasonably dangerous; (2) the defect existed at the time the product left the defendant's control; (3) the product was expected to and did reach the consumer without substantial change in its condition; (4) the plaintiff's injuries were proximately caused by the defective product. IND.CODE § 33–1–1.5–3(a); *see Underly v. Advance Mach. Co.*, 605 N.E.2d 1186, 1189 (Ind.Ct.App.1993).

■ The design defect about which the plaintiffs complain was not the cause of their accident, but it allegedly caused or enhanced the injuries Mrs. Rogers sustained as a result of the collision.[4] The Supreme Court of Indiana has held that such a claim is cognizable under Indiana law. *Miller v. Todd*, 551 N.E.2d 1139, 1142 (Ind.1990). The so-called "crashworthiness" doctrine imposes upon a manufacturer liability for design defects that, although not the cause of the initial accident, compound the occupants' resulting injuries

when they strike the automobile's interior or objects outside the vehicle. *Id.* at 1140 & n. 1. The doctrine recognizes the statistical inevitability of collisions and places upon the manufacturer a duty to use reasonable care in designing a vehicle to avoid subjecting the user to an unreasonable risk of injury in the event of an accident. *Id.* at 1141; *see Larsen v. General Motors Corp.*, 391 F.2d 495, 502 (8th Cir.1968) (holding that an automobile's expected use includes the ability to survive collisions).

■ In essence, the crashworthiness doctrine acknowledges the foreseeability of collisions and expands the proximate cause element of product liability actions to allow recovery for intensified or consequential injuries. *Miller*, 551 N.E.2d at 1142; *see also Whitted v. General Motors Corp.*, 58 F.3d 1200, 1205 (7th Cir.1995). However, the plaintiff has the burden of proving that a latent defect in the product proximately caused or enhanced his injuries. *Miller*, 551 N.E.2d at 1141; *see also Whitted*, 58 F.3d at 1205. Thus, under the crashworthiness doctrine, the term "defect" means more than simply that the product failed and caused injury; it means that the product failed to provide the consumer with reasonable protection given the circumstances surrounding a particular accident. *Miller*, 551 N.E.2d at 1143; *see also Pries v. Honda Motor Co., Ltd.*, 31 F.3d 543, 545 (7th Cir.1994). Put simply, the crashworthiness doctrine permits a plaintiff to prove a defect by demonstrating that a feasible, more practicable product design would have afforded better protection in the particular circumstances of the accident.

Defendants AlliedSignal and Ford first submit that the plaintiffs' sole design defect expert does not have the requisite experience or training contemplated by the Supreme Court of the United States in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S.

---

4. Although AlliedSignal and Ford originally contended that Gail Rogers was not wearing her seat belt at the time of the accident, *see* Defs.' Answers to the Compl.; Ford's Proposed Pre-Trial Order at 6–7, that issue is not raised by the defendants in their joint motion for summary judgment. Accordingly, because there is no factual dispute presented as to the use or non-use of

the seat belt, and because district courts are required on summary judgment motions to construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party, this court will presume for purposes of the present motion that the seat belt was in use when the collision occurred.

579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to testify as to the alleged defectiveness of the seat belt. The defendants further argue that the expert witness's proposed testimony is neither relevant nor based on the type of scientifically reliable methodologies called for by the Supreme Court in *Daubert.*

▮▮▮▮ · The Supreme Court's decision in *Daubert* provides a framework by which the district courts evaluate expert testimony proffered under Rule 104(a) of the Federal Rules of Evidence for possible admission under Rule 702.[5] Under the two-step *Daubert* analysis,[6] the trial court first must determine whether the expert's testimony is reliable— *i.e.*, whether it pertains to "scientific knowledge." *Cummins v. Lyle Indus.*, 93 F.3d 362, 367–68 (7th Cir.1996). Regardless of the type of scientific testimony involved, this requirement places upon the court the obligation to ensure "that the person possesses genuine expertise in a field and that [the] testimony 'adheres to the same standards of intellectual rigor that are demanded in [the person's] professional work.'" *Tyus v. Urban Search Management*, 102 F.3d 256, 263 (7th Cir.1996) (quoting *Braun v. Lorillard Inc.*, 84 F.3d 230, 234 (7th Cir.) (alterations supplied), *cert. denied,* —— U.S. ——, 117 S.Ct. 480, 136 L.Ed.2d 375 (1996)); *Bammerlin v. Navistar Int'l Transp. Corp.*, 30 F.3d 898, 901 (7th Cir.1994) ("A district judge should assure himself, before admitting ex-

pert testimony, that the expert knows whereof he speaks.").

Next, the district court must determine whether the· proffered evidence or testimony will assist the trier of fact in understanding the evidence. *Porter v. Whitehall Lab., Inc.*, 9 F.3d 607, 615 (7th Cir.1993); *see also Deimer v. Cincinnati Sub–Zero Prods., Inc.*, 58 F.3d 341, 345 (7th Cir.1995). The second step of the *Daubert* analysis is essentially a relevance inquiry. *Daubert,* 509 U.S. at 591, 113 S.Ct. at 2795; *see also Porter,* 9 F.3d at 613. The decision to permit or exclude expert scientific testimony is committed to the sound discretion of the court. *Cummins,* 93 F.3d at 367; *Bradley v. Brown,* 42 F.3d 434, 436–37 (7th Cir.1994).

▮▮▮ Rule 702 provides that "a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify" as to matters involving "scientific, technical, or other specialized knowledge." FED. R.EVID. 702. The present cause of action requires expert testimony of a technical nature based on scientific principles. The record shows that the plaintiffs' expert witness, Ned C. Myers, is a professional engineer by trade. He received his mechanical engineering degree from Purdue .University in 1967 and his registration as a professional engineer from the State of Indiana in 1972. Mr. Myers is also registered as a licensed plumb-

---

5. The case law of this circuit holds that the *Daubert* framework is not limited to cases involving "novel" scientific theories or methodologies, but rather is appropriate for all kinds of expert testimony—including "the application of science to a concrete and practical problem." *Cummins v. Lyle Indus.*, 93 F.3d 362, 367 n. 2 (7th Cir. 1996); *see also Tyus v. Urban Search Management,* 102 F.3d 256, 263 (7th Cir.1996). *But see Compton v. Subaru of America, Inc.*, 82 F.3d 1513, 1518–19 (10th Cir.1996) (limiting *Daubert's* application to cases of novel scientific theories or methodologies).

6. In *Tyus v. Urban Search Management,* 102 F.3d 256 (7th Cir.1996), the United States Court of Appeals for the Seventh Circuit employed a three-step analysis in evaluating the admissibility of social science testimony. The additional step requires a trial court to "determine whether the proffered testimony is based upon the expert's special skills." *Tyus,* 102 F.3d at 263. While the additional inquiry certainly is relevant to the evaluation of social science testimony,

it would appear that such an inquiry is no less relevant in any other scientific field. A scientific expert's credentials may be impeccable, but if the proffered testimony deals with matters outside the expert's area of expertise, the district court is justified in concluding under *Daubert* that the testimony would not assist the trier of fact in understanding the evidence or in determining a fact in issue. *See United States v. Hall,* 93 F.3d 1337, 1342 (7th Cir.1996); *Deimer v. Cincinnati Sub–Zero Prods., Inc.,* 58 F.3d 341, 345 (7th Cir.1995); *Porter v. Whitehall Lab., Inc.,* 9 F.3d 607, 615 (7th Cir.1993); *cf. Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 318 (7th Cir.1996) ("[A] district judge asked to admit scientific evidence must determine whether the evidence is genuinely scientific, as distinct from being unscientific speculation offered by a genuine scientist."). Thus, the court understands the additional step in *Tyus* to be merely an amplification of the *Daubert* analysis rather than an independent test applicable only to social science testimony.

ing contractor. His *curriculum vitae* shows that he has work experience in designing mobile, residential and commercial heating systems, electrical systems, plumbing systems, structural systems, and electromechanical and pneumatic controls. Mr. Myers has also supervised draftsmen, model makers and laboratory technicians.

By his own admission, Mr. Myers is not an expert in biomechanics, occupant kinematics or human anatomy, nor does he have any specialized training in post-accident examination of seat belt assemblies. Although he has performed compliance testing on seat belts, he has never designed a passenger restraint system. Mr. Myers has no experience working in the automotive industry and does not hold any patents in automotive design. His sole experience in accident reconstruction came shortly before his initial deposition in this cause when he took a three-day course in automotive accident reconstruction.

Mr. Myers concluded on the basis of several experiments that Mrs. Rogers's seat belt had opened due to inertial actuation during the accident. In October 1995, he tested the passenger-side seat belt assembly in the Rogers's wrecked Lincoln Town Car by fastening the buckle and latch together and then striking the back of the buckle with hammers of differing weights. The seat belt buckle occasionally released due to the force of the hammers' impacts.

In April 1996, Mr. Myers conducted several additional tests. In his first experiment, he clamped one end of the seat belt assembly to the edge of a wooden table and, grasping the opposite end, slapped the back of the buckle against both the bare surface of the table and a piece of foam placed on top of the table. The buckle opened when slapped against either surface. Mr. Myers also used a Chatillon gauge to measure the force necessary to open the buckle by pressing the release button. He examined the button's resistance both with and without tension on the seat belt webbing, the latter situation being achieved by suspending weights from one end of the seat belt. The button operated properly with and without tension. Additionally, Mr. Myers attempted to duplicate the conditions involved in the accident by placing a wooden mannequin in the Lincoln Town Car's seat belt and striking the mannequin from the side with a bag of weights. Although Mr. Myers repeated this "pendulum" test approximately a dozen times, the buckle never released.

Finally, Mr. Myers visited the accident scene and reviewed the police report, the hospital record, various photographs of the wrecked Lincoln Town Car, and an aerial photograph of the accident scene. He also reviewed the results of an HYGE sled test involving a tethered crash dummy and a frontal impact. On the basis of the experiments conducted and the materials reviewed, Mr. Myers concluded that (1) it is possible for a "Type I" side release buckle to open due to inertial forces; (2) because inertial actuation happens in the laboratory, it is possible for the same phenomenon to occur in the real world; (3) it is more likely than not that Mrs. Rogers's seat belt released due to inertial forces during the accident; and (4) a seat belt buckle designed with an end release button and an internal cam would have afforded better protection in the circumstances of the Rogers's accident.

■ In *Daubert*, the Supreme Court of the United States articulated several nonexclusive guideposts to assist the district courts in determining whether expert testimony can fairly be characterized as a scientific opinion: whether the proffered conclusion lends itself to verification by the scientific method through testing; whether the conclusion has been subjected to peer review; whether the conclusion has been evaluated in light of the potential rate of error of the scientific technique; and whether the conclusion is consistent with the generally accepted method for gathering the relevant scientific evidence. *Cummins*, 93 F.3d at 368; *Deimer*, 58 F.3d at 344; *Gruca v. Alpha Therapeutic Corp.*, 51 F.3d 638, 643 (7th Cir.1995); *Porter*, 9 F.3d at 615. It is well settled that "the focus must be solely on principles and methodology, not on the conclusions they generate." *Cummins*, 93 F.3d at 368 (citing *Daubert*, 509 U.S. at 595, 113 S.Ct. at 2797).

The plaintiffs argue that an alternative design would have afforded better protection in the specific circumstances of their acci-

dent, yet they offer no evidence of testing to support their conclusion. This circuit's case law has recognized the importance of testing in alternative design cases. In *Cummins,* the expert witness, whose education and experience were in agricultural engineering, proposed to testify as to the feasibility of alternative designs for an industrial trim press. The Court of Appeals, applying the first of *Daubert's* guideposts, held that "[t]he district court clearly acted well within its discretion in concluding that the absence of such testing indicated that the witness' proffered opinions could not fairly be characterized as scientific knowledge." *Cummins,* 93 F.3d at 369. Similarly, in *Deimer,* the Court of Appeals approved the district court's exclusion of expert testimony as to an alternative power cord wrap design, holding that "unverified statements that [are] unsupported by any scientific method ... provide[ ] no basis for relaxing the usual first-hand knowledge requirement of the Federal Rules of Evidence on the ground that the expert's opinion has a reliable basis in knowledge and experience of his discipline." *Deimer,* 58 F.3d at 345 (alterations supplied).

The Seventh Circuit has cautioned that hands-on testing is not "an absolute prerequisite to the admission of expert testimony," and that the objective of ensuring intellectual rigor "can be accomplished in a number of different ways, including through the review of experimental, statistical, or other scientific data generated by others in the field." *Cummins,* 93 F.3d at 369; *see also Porter,* 9 F.3d at 614 n. 6. As in *Cummins,* however, the opinions proffered by Mr. Myers clearly lend themselves to testing and substantiation through the scientific method. Even if it were infeasible, for example, for Myers personally to conduct the crash testing of representative vehicles, he nonetheless could have relied on statistical evidence to show that the nature and number of injuries associated with the proposed alternative seat belt design differ from those associated with the allegedly defective design. This he has not done.

In deciding whether proffered expert testimony meets *Daubert's* requirements, the district court's foremost objective must be to rule out " 'subjective belief or unsupported speculation.' " *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1106 (7th Cir.) (quoting *Daubert,* 509 U.S. at 590, 113 S.Ct. at 2795), *cert. denied,* 512 U.S. 1222, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994); *see also Porter,* 9 F.3d at 614. Here, the plaintiffs attempt to rely on expert testimony which lacks scientific rigor and offers nothing more than a "bottom line" conclusion. *See Rosen v. Ciba–Geigy Corp.,* 78 F.3d 316, 319 (7th Cir.) ("[A]n expert who supplies nothing but a bottom line supplies nothing of value to the judicial process....") (citation omitted), *cert. denied,* —— U.S. ——, 117 S.Ct. 73, 136 L.Ed.2d 33 (1996). Indeed, when questioned, the plaintiffs' expert concedes that *all* seat belt buckles designs with spring-loaded push button release mechanisms—including the end release design he proposes as a feasible, more practicable alternative—may be subject to inertial actuation if sufficient forces are applied in the proper direction. *See* Myers Dep. (June 6, 1996) at 378–79.

Nor is there any indication in the record that the basis for Mr. Myers' opinion satisfies the other factors highlighted by the Supreme Court in *Daubert.* The second *Daubert* guidepost considers whether the expert's conclusion has been subjected to peer review. By his own admission, Mr. Myers has not published any study concerning the safety and feasibility of his proposed design relative to the allegedly defective design in the Rogers's Lincoln Town Car. Moreover, there is substantial peer review literature which suggests that there is no basis for the allegation that "Type I" side release buckles are subject to "inertial actuation" during real world vehicle crashes. *See Michael B. James et al., SAE Int'l,* Pub. No. 930641, *Inertial Seatbelt Release* (1993) (Myers Dep., Exh. 24); *Edward A. Moffatt et al., Society of Automotive Engineers,* Pub. No. 959887, *Safety Belt Buckle Inertial Responses in Laboratory and Crash Tests* (1995) (Myers Dep., Exh. 28); *National Center for Statistics and Analysis, Inadvertent Safety Belt Unlatching, Summary of Findings* (1992) (Myers Dep., Exh. 22); *Office of Defects Investigation, National Highway Traffic Safety Administration,* Pet. No. DP92–017, *Inad-*

*vertent Release of Safety Belt Buckles* (1992) (Myers Dep., Exh. 21).

Thus, while nothing in the record suggests that there has been peer review of Mr. Myers' opinion specifically as to the safety of his proposed alternative design *vis-à-vis* that of the "Type I" design, Mr. Myers' conclusion that the "Type I" side release buckle is a defective design has been subjected to peer review and found lacking. "A known technique that has gained only a minimal following may be viewed with some skepticism." *Porter*, 9 F.3d at 613.

The third and fourth guideposts under *Daubert* are perhaps worthy of less emphasis in "as applied" situations such as the present case than in situations involving more abstract or novel scientific theories. *See Cummins*, 93 F.3d at 367 n. 2. Nevertheless, on the basis of the factors discussed above, the court finds that the expert's opinion is not grounded in "scientific knowledge" pursuant to *Daubert*'s first step and does not satisfy Rule 702 of the Federal Rules of Evidence. *See Pries*, 31 F.3d at 545 (evidence that dropping a seat belt buckle on a hard surface occasionally causes it to open "is not scientific and does not satisfy Fed.R.Evid. 702").

Even assuming, *arguendo*, that Mr. Myers' testimony were properly grounded in scientific methodology, this court still would conclude that his testimony should be excluded. The second step of the *Daubert* analysis requires the court to determine whether the testimony would assist the trier of fact in understanding the evidence. Here, the expert witness cannot relate his theory to the specific factual situation at hand—he has not attempted to quantify the forces involved in the accident, to analyze their duration, to determine the relative forces between the occupant and the restraint, or to compare the actual forces to those achieved in his experiments. The Supreme Court stated in *Daubert* that scientific testimony must "fit" the issue to which the expert is testifying to the extent that it is related to the facts of the case and will aid the trier of fact in resolving the dispute. *Daubert*, 509 U.S. at 591, 113 S.Ct. at 2796; *see also Porter*, 9 F.3d at 616. Thus, because there is no "fit" with Mr. Myers' testimony, the court concludes that the testimony would be of no help in evaluating the evidence.

Finally, even if the unverified exhibits to the plaintiffs' response were allowed and Mr. Myers' testimony were deemed admissible pursuant to *Daubert* and Rule 702, the plaintiffs still could not meet their burden of proving a feasible, more practicable design on the basis of the evidence before the court. Under Indiana law, a plaintiff may not establish a design defect simply by asserting its existence. *Whitted*, 58 F.3d at 1206. Moreover, the fact that a product failed in a particular accident does not by itself show that the product was defective. *Bammerlin*, 30 F.3d at 901. As the Seventh Circuit noted in *Pries*, "The question is not whether it is 'possible' for something untoward to occur during an accident but whether 'the design creates unreasonable danger' according to 'general negligence principles.' " *Pries*, 31 F.3d at 545 (citing *Miller*, 551 N.E.2d at 1141).

What a plaintiff must show to establish a "defect" under Indiana's crashworthiness doctrine is that an alternative design not only could have prevented the injury (or the enhancement of an injury) resulting from an accident, but that the design was cost-effective under general negligence principles. *Id.* at 546. Thus, "[t]he appropriate evidence for demonstrating that a particular seat belt design could have prevented an injury would be, for example, a study of failures for that design." *Whitted*, 58 F.3d at 1206; *see also Bammerlin*, 30 F.3d at 901 ("[D]ata on accident rates speak more loudly than abstract arguments."). In addition, the plaintiff would need to "compare the costs and benefits of alternative designs." *Pries*, 31 F.3d at 545; *Miller*, 551 N.E.2d at 1141–42.

Even ignoring the aforementioned evidentiary defects, the plaintiffs in the present case have not accomplished either task. With respect to the first element under *Miller*, the record contains no statistical evidence whatever regarding the relative failures of the side release and end release seat belt designs. Further, the fact that a manufacturer has changed designs since the allegedly defective model was manufactured

does not show that the previous design was a defective one. Finally, evidence that a seat belt buckle can be made to open with a hammer blow proves neither that the buckle opened in a particular accident nor, if it did, that an alternative design would have proven more effective. The only evidence offered by the plaintiffs with respect to *Miller*'s second element is that the cost increase for the alternative design is minimal. Such evidence does nothing to prove that the alternative design is either safer or more practicable.

The plaintiffs have failed to present evidence that the seat belt was flawed in its design and that a better design would have been cost-effective. Specifically, the plaintiffs have failed to come forward with specific facts to show that there is a genuine issue for trial. "Speculation is insufficient to withstand summary judgment; the nonmoving party 'must do more than simply show there is some metaphysical doubt as to the material facts.'" *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1127 (7th Cir.1996) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). Accordingly, the defendants are entitled to summary judgment.

■ Finally, although the plaintiffs argue that the defendants' motion for summary judgment applies only to their strict liability claim and not to their negligence claim, it is axiomatic that there can be no duty to warn where no design defect has been shown. *See Black v. Henry Pratt Co.*, 778 F.2d 1278, 1283 (7th Cir.1985); *American Optical Co. v. Weidenhamer*, 457 N.E.2d 181, 187 (Ind. 1983). Thus, summary judgment will be entered as to the entire cause of action.

### *CONCLUSION*

Prior to evaluating the defendants' motion for summary judgment, the court considered and **DENIED** Ford and AlliedSignal's motions to strike the plaintiffs' response. The court also considered and **GRANTED** Ford's motion to strike the plaintiffs' exhibits.

For the reasons described above, Ford and AlliedSignal's motion for summary judgment is **GRANTED**. All other pending motions are **DENIED AS MOOT. IT IS SO ORDERED.**