**Rachel M. DALE, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION; New United Motor Manufacturing, Inc.; Toyota Motor Corporation and Toyota Motor Sales U.S.A., Inc., Defendants.**

**No. CIV.A. 1:97CV1712–JEC.**

United States District Court,
N.D. Georgia,
Atlanta Division.

June 14, 1999.

## ORDER

CARNES, District Judge.

This case is presently before the Court on defendants' Motion to Preclude Testimony of Thomas Horton [38], defendants' Motion to Preclude Plaintiff's Experts John Brown, Jack Sink and Judy Edwards [39], defendants' Motion for Judgment as a Matter of Law Concerning Plaintiff's Claims of Defective Side Window Glass [40], defendants' Motion for Judgment as a Matter of Law Concerning Plaintiff's Claims for Inertial Seat Belt Unlatching [41], defendants' Motion for Judgment as a Matter of Law for Claims for Punitive Damages, Fraudulent Concealment and Litigation Expenses [42], and defendants' Motion to Strike Affidavit of Thomas B. Horton [55–1] and to Preclude Testimony [55–2]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that defendants' motions 38, 39, 40, 41, and 42 should be **GRANTED**, and that defendants' motion to strike [55–1] and to preclude testimony [55–2] should be **DENIED**.

## BACKGROUND

Plaintiff was injured in a single vehicle accident which occurred on State Route 282 in Gilmer County, Georgia on June 20, 1995. Plaintiff was driving her 1987 Chevrolet Nova to work and was approximately two miles from home when the accident occurred. She recalls that she buckled her seatbelt prior to leaving home. For some unknown reason, plaintiff lost control of the vehicle. It ran off of the road and into a field, rolling over. Plaintiff was ejected from the vehicle. As a result of this tragic accident, plaintiff suffered severe injuries and is permanently paralyzed.

Plaintiff brings this products liability action in negligence and strict liability. Plaintiff claims that the door latch of the vehicle was defective and, as a result of the defect, the door opened during the accident. She also claims that the seat belt was defective and, consequently, that it unlatched during the accident due to inertial forces. Plaintiff concludes that, but for these alleged defects, she would not have been ejected from the vehicle and, had she been properly retained in the vehicle, she would not have suffered significant injuries in the accident.

Defendant has filed several pre-trial motions, seeking to preclude the testimony of several of plaintiff's proffered experts and seeking partial summary judgment. These motions are addressed below.

## DISCUSSION

### I. MOTIONS RELATED TO POTENTIAL FOR INERTIAL UNLATCHING OF SEATBELT

#### A. *Motion to Preclude Testimony of Thomas Horton [38]*

Defendants request that this Court exclude the testimony of Thomas Horton, a mechanical engineer with 18 years of experience in the automotive safety restraint industry. Mr. Horton testified in his deposition that the seat belt in the subject vehicle inertially unlatched during plaintiff's accident, allowing her to be ejected from the vehicle and compounding her injuries. Inertial unlatching, he explains, can occur when the housing of the seat belt buckle is abruptly accelerated or hit on the back side while the spring-loaded seat belt button and attached portions of the latching mechanism, due to their inertial mass, remain momentarily at rest. This simulates the ordinary depression of the seat belt button, causing a release of the buckle to occur. (Horton Dep. at 57–58.) He concludes that a buckle designed with an end release button, rather than a side release button such as that found in the subject vehicle, would have afforded plaintiff better protection in the accident. (*Id.* at 99–101.)

■ Defendants argue that the theory of inertial unlatching is merely a "parlor trick" and that the conditions necessary to create inertial unlatching do not occur in real world accidents. Defendants point out that, after conducting numerous surveys and tests, the National Highway Traffic Safety Administration ("NHTSA") and its foreign counterparts in the United Kingdom, Canada and Australia have all concluded that inertial unlatching is not a safety concern because it does not occur in real world conditions. Additionally, defendants' expert, Dr. Donald E. Struble, has conducted research regarding inertial release and, like other researchers, has concluded that the isolated forces exerted when the back of a buckle is struck with a hard object are quite different than the forces exerted upon a seat belt buckle during an actual crash. (Defs.' Mot. to Exclude Testimony [38], Ex. G, Struble *et al.*, Society of Automotive Engineers ("SAE") Paper 930641.) For these reasons, defendants maintain that Mr. Horton's position lacks support in the engineering community and is not supported by relevant theory and testing, thus defendants contend that Mr. Horton's testimony fails to meet the standards of admissibility of scientific evidence set forth in Rule 702

of the Federal Rules of Evidence [1] and by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

■ When deciding whether expert testimony is admissible, the district court must act as a gatekeeper and carefully analyze the testimony prior to allowing the finder of fact to hear the testimony. *See Daubert,* 509 U.S. at 597, 113 S.Ct. 2786 (advocating "gatekeeping role for the judge"). In *Daubert,* the Supreme Court concluded that the standard for evaluating the admissibility of expert testimony is found in Rule 702 of the Federal Rules of Evidence. *Id.* at 588, 113 S.Ct. 2786. Rule 702 provides that, "[if] scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," an expert "may testify thereto." FED. R. EVID. 702 (1999). The Supreme Court recently held that the district court's gatekeeping obligation "applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999).[2]

■ In order to determine whether the expert is testifying to knowledge that will assist the trier of fact in understanding or determining a fact in issue, the court must "make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at

issue." *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786. *Daubert* identified four factors which a court may consider when evaluating whether a particular theory or study is reliable:

(1) whether the theory in question can be and has been empirically tested;

(2) whether the theory in question has been subjected to peer review and publication;

(3) the theory's known or potential error rate and whether that rate is acceptable; and

(4) whether the theory is generally accepted in the scientific [or otherwise applicable] community.

*Id.* at 593–95, 113 S.Ct. 2786. As the Supreme Court emphasized in *Kumho Tire,* however, "the test of reliability is 'flexible,' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case .... Rather, the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire,* 119 S.Ct. at 1171. Application of the *Daubert* considerations to the testimony offered by plaintiff's expert, Mr. Horton, reveals that his testimony regarding the concept of inertial release is neither reliable nor relevant to the accident in the case at bar.

■ First, the theory in question can be and has been tested. Indeed, the theory of inertial release has been generally rejected as a real world occurrence. *See* discussion *infra.* Nevertheless, plaintiff's

1. When exercising diversity jurisdiction, a federal court must utilize the Federal Rules of Evidence to decide evidentiary issues. *See Bradley v. Brown,* 42 F.3d 434, 436 (7th Cir. 1994) (applying *Daubert* framework derived from Rule 702 to determine admissibility of expert testimony in products liability suit where jurisdiction was founded upon diversity).

2. Plaintiff argues, in part, that Mr. Horton's testimony is not based on any novel scientific

theory, but on standard automotive mechanical engineering concepts based on his own observations and experience with automotive restraints and, as such, should be admissible under *Carmichael v. Samyang Tire, Inc.,* 131 F.3d 1433 (11th Cir.1997). The Supreme Court decided *Kumho Tire* in March, 1999, reversing the Eleventh Circuit's decision *after* the parties submitted their arguments to the Court and, consequently, plaintiff's argument is rendered without foundation.

expert relies on three tests which he believes establish that inertial release can occur during an automobile accident. The first of these is the demonstration he would like to present to the jury, a "pendulum test." It involves taking an exemplar of the subject seat belt assembly and striking the back of the buckle housing with a hard object. Although Mr. Horton had not even attempted this experiment prior to his deposition, he described it. *See* discussion *infra*, Section II.B.1. The test is not uncommon and, subsequent to his deposition, Mr. Horton tried the pendulum test using an exemplar buckle. He states that he "was able to cause a release of the latch plate from the buckle on the one sample that I attempted by impacting the back side of the buckle housing." (Horton Aff. at ¶ 3.) This vague description does little to establish that Mr. Horton's *post hac* "experiment" bears relevance to what happens in an actual car crash.

Indeed, the act of intentionally opening a buckle by striking the back side of the buckle housing has been referred to as a "parlor trick" since 1966. (Defs.' Mot. to Exclude Testimony [38], Ex. F, Moffat *et al.*, SAE Paper 950887 at 208.) As researchers Edward Moffatt, Terry Thomas and Eddie Cooper explain in their SAE paper, the forces at work in a pendulum demonstration test are much more severe than those present in any accident scenario and, thus, are not representative of the forces involved in an actual crash. (*Id.*) Defendants' expert, Dr. Struble, explains that webbing tension, as well as the proximity of the buckle to the seat occupant, preclude inertial unlatching in real world accidents. (Defs.' Mot. to Exclude Testimony [38], Ex. G, Struble SAE Paper 930641 at 59–62.)

Indeed, both the NHTSA and the SAE have found the pendulum test to be unreliable because it fails to take into consideration, among other things, webbing tension: the tension that occurs when force is applied to the seat belt strap. Tension in the webbing increases rapidly as the seat belt occupant is thrown into the webbing of the seat belt—that is, when the occupant "loads" the belt—during the collision. As webbing tension increases, the amount of force necessary to inertially release the buckle also increases. As Moffat noted in one SAE paper, "even small webbing tensions essentially preclude inertial release because the accelerations required for release are too high." (Defs.' Mot. to Exclude Testimony [38], Ex. F, Moffat *et al.*, SAE paper 950887 at 195; *see also* Ex. G, Struble SAE Paper 930641 at 62; Ex. E, FMVSS Study, Appendix D.) Mr. Horton offers no evidence to contradict the documented, accepted influence of webbing tension on the potential for inertial release.

Another factor which prevents a seat belt from releasing during a real world accident, according to researchers, is the proximity of the passenger to the seat belt buckle. In a pendulum test, a person hits the back of the buckle housing with a seemingly low severity impact, causing the buckle to open. In fact, the velocity of the impact necessary to open the buckle, even in the absence of webbing tension, is in the range of 15 miles per hour. Researchers explain that it is not possible to achieve this velocity in real accidents because of the small distances that exist between occupants and the seat belt buckle. (*See* Defs.' Motion to Exclude Testimony [38], Ex. E, FMVSS Report, Appendix D.) Dr. Struble's research shows that there is virtually no distance at all between a large occupant's hip and the buckle. Plaintiff in this case, at the time of the accident, was approximately five feet, eight inches tall and weighed 250 pounds (Horton Dep. at 34); therefore, in light of Dr. Struble's data, plaintiff would have had full to partial contact with the buckle prior to her accident. As Dr. Struble explains, "[w]hen the occupant is in full contact with the buckle prior to the collision, the only opportunity for any relative speed to develop between them will be during the period of body compression." (Defs.' Motion to Exclude Testimony [38], Ex. F, Struble SAE

Paper at 67.) Even where there is a gap between the occupant and the buckle, the distances are small enough "to substantially limit the potential for a significant velocity to develop." (*Id.*)

Referring to two General Motors crash tests conducted in June and December 1991, Mr. Horton maintains that the close proximity of the buckle has little or no bearing on the potential for inertial release. The tests he describes were side impact tests in which a test dummy was seated in a rear seat wearing a three-point lap and shoulder belt with a side release buckle. The latch plate in each test released from the buckle early in the impact, although there was little space between the dummy hip and the back of the buckle prior to impact. (Horton Aff. at ¶ 12.) These tests are distinguishable for two reasons. First, they each involved a side-impact test, rather than a roll-over test, and the forces exerted on the passenger's body in these tests are notably different. (*See generally,* Defs.' Mot. to Exclude Testimony [38], Ex. E, FMVSS Study, Appendix D.) Second, crash test dummies are two to three times stiffer than humans, so the force of acceleration of the dummy against the buckle during a crash test is "roughly 1.5 to 1.75 times higher than that experienced in comparable real-world collisions." (Defs.' Motion to Exclude Testimony [38], Ex. G, Struble SAE Paper at 67–68.)

There is no valid connection between the proffered evidence and the conditions presented in the case at bar. *See Daubert,* at 591–92, 113 S.Ct. 2786. Moreover, Mr. Horton refers to no test which would establish that a buckle with an end release button is any more reliable than the subject buckle. *Compare Rogers v. Ford Motor Company,* 952 F.Supp. 606, 615 (N.D.Ind.1997) (noting that expert conceded that all seat belt buckles with spring-loaded push button release mechanisms, including end-release designs, may be subject to inertial actuation if sufficient forces are applied in proper direction). Plaintiff's witness has not demonstrated how his theory relates to the factual situation at hand—that is, "he has not attempted to quantify the forces involved in the accident, to analyze their duration, to determine the relative forces between the occupant and the restraint, or to compare the actual forces to those achieved in his experiments." *Id.* at 616. For these reasons, the Court finds that the pendulum test is unreliable and is, in fact, of little relevance to explain the forces at work in plaintiff's accident. *Compare Pries v. Honda Motor Co., Ltd.,* 31 F.3d 543, 545 (7th Cir.1994) (evidence that dropping a seat belt buckle on a hard surface occasionally causes it to open "is not scientific and does not satisfy" Rule 702); *Rogers,* 952 F.Supp. at 617 (N.D.Ind.1997) ("evidence that a seat belt buckle can be made to open with a hammer blow proves neither that the buckle opened in a particular accident nor, if it did, that an alternative design would have proven more effective"); *Lytle v. Ford Motor Company,* 696 N.E.2d 465, 471 (Ind.Ct.App.1998) (excluding expert testimony regarding inertial release of seat belt and finding pendulum tests unreliable).

Another consideration weighing against admission of Mr. Horton's testimony is that the concept of inertial release as a real world proposition has been rejected by the scientific community at large.[3] As

---

3. Plaintiff argues that the SAE publications are "largely composed of, influenced by, if not controlled by, the automotive industry." (Pl.'s Response [49] at 23.) Plaintiff concludes that researchers such as Moffatt and Struble "testify exclusively for the automotive industry and other large corporate interests," and thus it would be "naive and fundamentally unfair" for the Court to accept the results

of these studies. (*Id.*) The Court finds that the detailed explanations in these studies, as well as the comparable studies conducted by the NHTSA, are persuasive. To ignore the content of these simply because the authors have testified previously for GM or other automobile manufacturers would be misguided. There is absolutely no evidence that the results contained in these publications are less

discussed above, researchers have published SAE papers describing the results of their studies regarding rollover crash tests, full scale sled tests and laboratory tests. From their studies, the researchers concluded that the conditions necessary for inertial unlatching do not exist in real world crashes. (Defs.' Mot. to Exclude Testimony [38], Ex. F, Moffat *et al.* SAE Paper 950887 at 193, 196, 208–209; Ex. G, Struble *et al.* SAE Paper 930641 at 59–62.)

Similarly, the NHTSA conducted an investigation regarding the purported problem of inertial unlatching upon petition by the Institute of Injury Reduction ("IIR") in 1992. The NHTSA reviewed laboratory tests, crash tests, accident data, data from automobile manufactures and seat belt suppliers, and information from NHTSA's foreign counterparts. Ultimately, the NHTSA denied the IIR's petition for rulemaking, finding "no pattern of evidence to support the allegation of inadvertent unlatching of side release buckles." (Defs.' Mot. to Exclude Testimony [38], Ex. D, Denial of Petition, 57 FR 55298–55299; *see also* Ex. E, NHTSA Report, Inadvertent Release of Safety Belt Buckles, 57 FR 55298.) The NTHSA further noted that "[l]aboratory testing performed in response to this Petition defined the engineering characteristics that can cause inertial unlatching. Most important, this testing demonstrated that these characteristics are not present in real world crashes." (*Id.*)

In response, plaintiff has submitted no evidence that anyone in the scientific or engineering community has embraced the concept of inertial release in real world accidents. Plaintiff's expert simply disagrees based on his extensive experience in the automotive safety restraint industry and his application of "fundamental mechanical engineering principles." (Horton

Aff. at ¶ 17.) Mr. Horton's credentials are indeed impressive, nevertheless, without more, the Court can not conclude that his opinion is credible. It is the Court's responsibility to rule out "subjective belief or unsupported speculation." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. Accordingly, the Court concludes that Mr. Horton's testimony is neither reliable nor relevant in light of *Daubert's* standards and thus defendants' Motion to Exclude Testimony should be granted.

**B. Motion to Strike Affidavit of Thomas B. Horton [55–1] and to Preclude Testimony [55–2]**

Defendants request that the Court strike certain portions of the affidavit submitted by Mr. Horton in response to defendants' Motion to Preclude Testimony and to preclude Horton from offering any testimony in this case concerning work performed and opinions developed after the close of discovery. (Defs.' Motion to Strike and to Preclude [55] at 1.) As a result of extended deadlines, the parties in this case have had over a year to conduct discovery in this case. The case was filed in June, 1997, and Mr. Horton was not deposed by defendants until April 10, 1998.

**1. Testimony related to post-discovery pendulum test**

Prior to his deposition, Mr. Horton did not conduct any tests related to inertial unlatching. (Horton Aff. at ¶¶ 2–3.) After his deposition, however, Mr. Horton obtained exemplar buckles and performed a pendulum test as described above on one of the exemplars. In his affidavit, Mr. Horton states that he was "able to cause a release of the latch plate from the buckle" in a pendulum test. (Horton Aff. at ¶ 12.) As defendants point out, Mr. Horton's affidavit provides no details concerning the method of testing. Defendants seek to

than accurate or that the authors were biased any more so than Mr. Horton is biased in favor of plaintiff in offering his opinions as to inertial unlatching. The fact that a scientist

or an engineer serves as an expert witness in a lawsuit does not ultimately discredit all of his or her subsequent research and publications.

preclude any testimony relating to this post-deposition testing because defendants were not made aware of it until January 14, 1999, when plaintiff submitted her response to defendants' Motion to Preclude Testimony. Indeed, defendants explain that they have had no opportunity to conduct discovery regarding the details of this testing due to plaintiff's late disclosure. Plaintiff, however, maintains that the simple pendulum test was described by Horton in his deposition, even though he did not actually conduct the test until after his deposition, and thus any subsequent testing related to Horton's deposition testimony should be admitted. (*See* Horton Dep. at 55–62.)

The pendulum test is simple, easily replicated, and generally understood in the scientific or engineering community. Nevertheless, defendants would be prejudiced by any further testimony by Mr. Horton regarding this experiment. Defendants were unable to question Mr. Horton about the conditions under which the test was performed, whether and to what effect attendant circumstances influenced the results, what forces were applied to the buckle housing, or how many attempts it took to achieve a release of the latch plate.

In deciding defendants' Motion to Preclude Testimony above, however, the Court allowed Mr. Horton and plaintiffs some leeway and thus considered the pendulum test as described by Horton in his affidavit. The Court found this test to be unreliable both in theory and in application, and not representative of the conditions presented in real world collisions. As a result of the Court's holding precluding Mr. Horton's testimony in its entirety as it relates to inertial release, defendants' motion to strike the portion of Horton's affidavit related to the post-discovery pendulum test and to prevent further testimony regarding the test is moot.

### 2. Testimony regarding GM crash tests

Defendants also seek to preclude any testimony related to the June and De-

cember 1991 GM crash tests discussed in Mr. Horton's affidavit which he contends support his theory of inertial release. (Horton Aff. at ¶¶ 12–13.) Mr. Horton specifically referred to these tests in his deposition. (Horton Dep. at 59.) The deposition testimony regarding these crash tests did not discuss the tests in depth, nevertheless, defendants were given sufficient notice of Horton's reliance on these tests. For these reasons, defendants' motion to strike with regard to the GM crash tests is denied. The Court determined above, however, that, without more, the results of these side impact crash tests bore little relevance to the rollover accident in which plaintiff was involved.

### C. *Motion for Judgment as a Matter of Law Concerning Plaintiff's Claims for Inertial Seat Belt Unlatching [41]*

Plaintiff submits no further evidence, other than Mr. Horton's testimony, of inertial unlatching. Even though exclusion of plaintiff's proffered expert has the result of foreclosing plaintiff's claim that the seat belt was defective, this fact does not alter the Court's duty to apply properly the rules of evidence to this case. Because Mr. Horton's testimony is precluded under *Daubert*, there remains no material issue of fact with regard to this issue and, therefore, the Court grants defendants' motion for judgment with respect to plaintiff's claims of product defect resulting from inertial seat belt unlatching.

### II. DEFENDANTS' MOTION TO PRECLUDE PLAINTIFF'S EXPERTS BROWN, SINK AND EDWARDS

Defendants request that this Court disallow the testimony of plaintiff's proffered experts John Brown, Jack Sink and Judy Edwards because these experts were not identified by plaintiff until after the close of an extended discovery period. The Court finds that plaintiff's designation of

these experts is procedurally and exceedingly defective, and agrees that their testimony should be disallowed.

In a proposed draft of a joint pre-trial order sent by facsimile to defendants' counsel on October 12, 1998, plaintiff first revealed her intention to call John Brown as an economic expert and to call Jack Sink and Judy Edwards as vocational rehabilitation specialists. (Defs.' Mot. to Preclude Testimony [39], Ex. K.) Plaintiff filed this action along with accompanying mandatory disclosures on June 13, 1997. (*Id.*, Ex. A, Complaint; Ex. B., Plaintiff's Mandatory Disclosures.) Some experts were identified, but Brown, Sink and Edwards were not identified at that time. In plaintiff's response to defendants' first interrogatories, filed November 4, 1997, plaintiff stated that there "may be additional experts not currently disclosed but will probably be limited to life care plan professional and/or economist." (*Id.*, Ex. J, Pl.'s Response to Defs.' First Interrogatories, No. 9.) Brown, Sink and Edwards were not identified at that time, however.

The Court extended discovery in this case three times, and set the final discovery deadline at August 23, 1998.[4] All experts were to be identified by January 31, 1998, and all experts were to be submitted for depositions on or before May 5, 1998. At the close of discovery, plaintiff still had not disclosed her intention to call Brown, Sink and Edwards as experts.

As noted, plaintiff did not identify Brown, Sink or Edwards until October 12, 1998, long after the discovery deadlines had expired. Even then, plaintiff failed to provide the qualifications, proposed testimony, basis for proposed testimony and opinions, and case lists for Brown, Sink and Edwards as required by Rule 26(a)(2) of the Federal Rules of Civil Procedure.[5] Plaintiff merely indicated that, once these experts completed their reports, the reports would be made available to defendants and that defendants could depose the experts prior to trial. (Defs.' Mot. to Preclude Testimony [39], Ex. K.)

■ Defendants moved to preclude the testimony of Brown, Sink and Edwards because plaintiff failed to timely identify them as experts prior to the close of discovery and failed to comply with Rule 26(a)(2). Defendants maintain that they will be prejudiced if plaintiff is allowed to call Brown, Sink and Edwards as witnesses, particularly in light of the fact that it appears that plaintiff did not even retain these witnesses until after the close of discovery.

Plaintiff responds that defendants were on notice that this type of expert testimony could be anticipated based on plaintiff's response to defendants' first interrogatories. Plaintiff explains that no report has been provided to defendants' counsel pursuant to Rule 26(a)(2) because the witnesses have not completed their reports. In fact, plaintiff's treating doctors' deposi-

---

4. Discovery deadlines were extended in the Court's orders of October 6, 1997[13], November 10, 1997[17], and March 13, 1998[31]. The parties filed Amended Consolidated Discovery Schedules in conformity with the Court's orders on October 27, 1997[16], February 11, 1998[28], and April 15, 1998[34].

5. Rule 26(a)(2) addresses the required disclosure of expert testimony, and provides in section (B):

> Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case ... be accompanied by a written

report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

FED. R. CIV. P. 26(a)(2)(B) (1999).

tions were taken by consent of counsel on November 2 and 3, 1998, after the close of discovery. Plaintiff maintains that Brown, Sink and Edwards could not complete their reports until after they could obtain the information from the medical depositions, reasoning that it is plaintiff's counsel's "general practice and belief that the decision to use this type of expertise is usually made basically at the end of a case . . . ." (Pl.'s Response [48] at 1.) Thus, plaintiff requests that the Court allow her to go forward with the preparation of the experts' reports and allow defendants' to depose them "so long as it does not delay trial in this matter." (*Id.* at 2.)

The Court cannot discern how the late addition of three experts could do anything *but* delay trial in light of the fact that their reports are not completed and defendants have not had an opportunity to depose them. All medical records of plaintiff's treating physicians were produced well before the close of discovery. Plaintiffs late-proposed experts could have been given access to these records, and plaintiff fails to refer to any information sought in the treating physicians' depositions that was not previously available in the records provided which would have added to or changed the experts' testimony.

Accordingly, the Court sees no reason why plaintiff could not have, at the very least, identified Brown, Sink and Edwards as potential witnesses from the outset of this litigation. If plaintiff's counsel believed it was necessary to allow Brown, Sink and Edwards some additional time to finalize or refine their reports after all other evidence was in, it could have asked for an extension in a timely, procedurally-appropriate manner. Instead, plaintiff waited until nearly two months after the close of discovery to identify these experts. Simply because defendants were placed on notice that plaintiff might use this *type* of expert testimony does not grant plaintiff license to identify experts this late in the litigation. Indeed, if the Court allowed plaintiff to use these experts, it would un-

dermine and subvert the discovery process which was, in fact, thrice extended in this case. *Compare Hancock v. Hobbs,* 967 F.2d 462, 468 (11th Cir.1992) (affirming district court decision to preclude expert testimony where expert was not disclosed until after close of extended discovery). The Court is, quite honestly, dumbfounded at this approach to litigation. Defendants' motion to preclude the testimony of Brown, Sink and Edwards is, therefore, granted.

## III. UNOPPOSED MOTIONS FOR SUMMARY JUDGMENT

### A. *Defendants' Motion for Judgment as a Matter of Law Concerning Plaintiff's Claims of Defective Side Window Glass [40]*

Plaintiff alleges primarily that the seatbelt and the door latch in the 1987 Chevrolet Nova were defective. In the alternative, plaintiff alleges that the glazing used in the side windows of the vehicle was defective—that is, because the windows were made of laminated glass, rather than of tempered safety glass, the glass shattered and fell out of the window opening and failed to provide an adequate means of restraint. (Pl.'s Complaint [1] at ¶¶ 13–15.) Defendants filed this motion for summary judgment regarding plaintiff's allegation that the side window glass in the subject vehicle was defective, maintaining that the record is devoid of any evidence that the use of laminated glass in the driver's window would have prevented plaintiff's ejection from the vehicle and her resulting injuries. (Defs.' Mot. for Judgment as a Matter of Law Concerning Plaintiff's Claims of Defective Side Window Glass [40].)

Plaintiff's concede that this motion should be granted. (Pl.'s Response [45] at 1.) Plaintiff explains that counsel decided to concentrate on their initial theory of the case—that the seat belt and the door latch were defective and failed to prevent plaintiff's ejection from the vehicle—rather than confuse the issues with the alterna-

tive theory that the side window glass was defective. (*Id.*) Because plaintiff does not oppose defendants' motion, the Court hereby grants defendants' motion and orders that all of plaintiff's claims related to the alleged defect in the side glass window are dismissed with prejudice.

### B. Defendants' Motion for Judgment as a Matter of Law for Claims for Punitive Damages, Fraudulent Concealment and Litigation Expenses [42]

Defendants also seek summary judgment with regard to plaintiff's claims for punitive damages, fraudulent concealment and litigation expenses. Plaintiff, "[a]s a matter of trial strategy," voluntarily withdraws each of these issues. (Pl.'s Response [47].) Again, because plaintiff does not oppose defendants' motion, the Court hereby grants defendants' motion and or-

ders that plaintiff's claims for punitive damages, fraudulent concealment and litigation expenses are dismissed with prejudice.

### CONCLUSION

For the foregoing reasons, the Court finds that defendants' motions at 38, 39, 40, 41, 42 should be **GRANTED**, and that defendants' Motion to Strike Affidavit and to Preclude Testimony should be **DENIED AS MOOT** as to testimony regarding pendulum test and **DENIED** as to testimony regarding 1991 crash tests.