In the

# United States Court of Appeals

### For the Seventh Circuit

No. 09-3489

ALLIANCE 3PL CORPORATION, formerly known
as Alliance Logistics, Inc.,

*Plaintiff-Appellee*,

*v.*

NEW PRIME, INC., doing business as Prime, Inc.,

*Defendant-Appellant*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 4944—**Elaine E. Bucklo**, *Judge*.

ARGUED FEBRUARY 18, 2010—DECIDED AUGUST 2, 2010

Before EASTERBROOK, *Chief Judge*, and KANNE and
ROVNER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*.   Alliance 3PL Corporation
handles the transportation needs of its customers. It
purchases transportation services from air, water, and
land carriers, and it allocates this capacity to customers
that need to move their own goods or supplies. Alliance
may be able to consolidate multiple customers' ship-

ments into full loads, reducing the cost per ton-mile; even if it cannot do this, a transport-management service enables customers to concentrate on their core businesses and stop fretting about shipping. The 3PL business (for third-party logistics management) is an aspect of the division of labor. The Wikipedia entry "3PL" describes other functions that firms such as Alliance perform; today's dispute arises from its role in arranging for transportation, and we need not discuss warehousing, inventory control, and additional services in the 3PL business.

Until spring 2003 Loders Croklaan USA, a producer of fats and oils used by the food industry, dealt directly with motor carriers. Prime, Inc., was among the carriers that Loders used to move its products to customers from 1998 through 2003. (Some of this transportation was on bills of lading from Loders and some was arranged and paid for by its customers, such as Pillsbury.) In March 2003 Loders hired Alliance to manage its shipping. Alliance employed Prime to haul some of Loders's output. The contract between Alliance and Prime, signed in 2000 when Alliance first used some of Prime's services (obviously for customers other than Loders, which was not yet one of Alliance's clients), contains what the parties call a back-solicitation clause:

> [Prime] shall not solicit traffic from any shipper, consignee, or customer of [Alliance] where [Prime] first knew the availability of such traffic as a result of [Alliance's] efforts or the traffic of [Alliance], consignee, or customer of [Alliance] was first tendered to [Prime] by [Alliance].

A jury concluded that Prime violated this clause by carrying bulk goods for Loders after the Loders-Alliance contract ended in 2007, and it awarded Alliance about $2.2 million in damages. The district court denied Prime's motions under Fed. R. Civ. P. 50 and 59.

Prime carried freight for Loders while the Alliance contract was in effect and submitted a bid to Loders to do the same work after the Alliance contract ended. The parties debate whether Prime "solicited" this business: Prime says that Loders took the initiative (the contract between Alliance and Loders did not prohibit Loders from placing business with carriers that Alliance had used), while Alliance says that Prime inveigled Loders to request a bid and thus effectively solicited Loders's business. Like the district court, we think that the evidence allowed a reasonable jury to resolve that question in Alliance's favor.

It is undisputed that Prime had carried some of Loders's goods (including bulk cargo in tankers) for years before Loders hired Alliance to manage its shipping. This leads Prime to contend that it did not "first know the availability of such traffic as a result of" Alliance's efforts. A back-solicitation clause ensures that a carrier (such as Prime) introduced to a shipper (such as Loders) through a 3PL won't poach the business; it effectively allocates to the 3PL the property right in information about which shippers need what transportation service. But Prime did not learn about Loders, or its business, through Alliance; Prime already had that information because it had been picking up freight from Loders since 1998.

Whether Loders, Pillsbury, or someone else arranged for any given shipment during 1998 to 2003, and whether those shipments were arranged by long-term contract or spot transactions, the fact remains that Prime's knowledge of Loders's business was acquired independent of Alliance.

Prime contended that it was entitled to summary judgment because it did not learn about Loders's traffic through Alliance. The 3PL replied that Loders substantially increased the volume of its bulk shipping in tankers during 2005 and 2006, while the Loders-Alliance contract was in place, and that Prime had increased the size of its own tanker fleet as a result. Alliance contended that Prime learned of this incremental "traffic" through Alliance, and that the back-solicitation clause therefore blocked Prime from carrying any freight for Loders (or at least any more of Loders's freight than it had been carrying before March 2003). Prime contended, to the contrary, that the word "traffic" in a back-solicitation clause refers to the existence of a shipper, and the general nature of its transportation needs, rather than the gross weight of goods that the shipper tenders to carriers. On this understanding Prime did not learn of Loders's "traffic" through Alliance.

When denying Prime's motion for summary judgment, the district judge stated that the word "traffic" is ambiguous. Come the trial, the judge did not define the word for the jury. Nor did the judge tell the jurors that they needed to decide whether the word "traffic" means the *existence* of a shipper and the general nature of its

needs, or instead means the *volume* of transportation services a (known) shipper requires. The judge gave the jurors no guidance on that topic and did not frame any concrete question that required resolution. Instead the judge allowed both sides to argue their positions.

Because the judge was non-directive (something that the parties knew long before the jury instructions were delivered), each side attempted to bolster its position with testimony from experts. The meaning of "traffic" might depend, for example, on the customs and general understandings of the industry, and then the jurors would need evidence about usage of trade to reach a verdict. But neither side introduced any evidence about how people in the transport (or 3PL) businesses understand the word "traffic." Instead Alliance produced an expert who testified that shippers usually notify 3PL companies of their existing clientele, which may be provided for expressly in a back-solicitation clause.

When Prime argued on appeal that experts should not be allowed to define words in legal documents—that this is a function for the judge, see *Bammerlin v. Navistar International Transportation Corp.*, 30 F.3d 898 (7th Cir. 1994)—Alliance replied that its expert had not so much as hinted at the meaning of the word "traffic" but had simply furnished the jurors with background about the industry. For its part, Prime tendered an expert who proposed to testify that the background narrated by Alliance's expert was not factual. The district judge prevented Prime's expert from testifying about that subject, and Prime protests the asymmetric treatment.

Whether the judge abused her discretion in the handling of the expert testimony is another topic we need not explore, because Alliance's disclaimer of any trade-specific meaning of the word "traffic" undermines the verdict. Alliance's evidence concerned how many loads Prime had carried for Loders before March 2003, rather than the meaning of the word "traffic". The jury evidently concluded that Prime should be held to its old level of business after the Loders-Alliance contract ended. But that's possible only if "traffic" has the meaning that Alliance favors.

Prime relies on the ordinary meaning of the word "traffic" plus the ordinary function of a clause such as this one: to prevent the carrier from poaching business that it learned about only through the 3PL's (costly) efforts to match a shipper with the optimal carrier. Had it never done any business through Alliance, Prime was bound to get in contact with Loders again as soon as Alliance ceased to be Loders's sole agent for procuring transport. Prime's straightforward position has the support of Illinois law, which supplies the rule of decision: Illinois understands non-compete clauses to cover no more than the reasonable import of their language and does not allow expansive readings of restrictive covenants, because more competition often serves the public interest in low prices. See *Cambridge Engineering, Inc. v. Mercury Partners 90 BI, Inc.*, 378 Ill. App. 3d 437, 447, 879 N.E.2d 512, 522 (2007).

A party that wants to depart from a straightforward understanding of contractual language has two princi-

pal routes: parol evidence and usage of trade. Yet Alliance did not offer any parol evidence showing that, when Prime and Alliance negotiated their contract, they discussed what the word "traffic" means, or that the negotiation history favors one meaning of "traffic" over another. This leaves the possibility that "traffic" is a term of art in the transportation business. As we have recounted, however, Alliance denies that its expert testified about usage of trade. Reading "traffic" to mean "increase in traffic" or "oodles of traffic" therefore lacks any support on this record. At oral argument, Alliance's lawyer suggested that the expert's testimony supports reading "traffic" to mean "the sort of freight carried under this contract"—but if that's the word's meaning, then Alliance loses, because Prime did not learn through Alliance that Loders ships fats and oils in bulk tankers, and the back-solicitation clause covers only traffic that Prime "first knew" about as a result of doing business with Alliance.

The people who were managing Loders and Prime in 2009, when the case was tried, testified that in 2005 and 2006 they did not know what freight Prime had carried for Loders from 1998 through 2003. The knowledge of Loders's managers is irrelevant under the back-solicitation clause, which asks what Prime knew rather than what Loders remembered. And the fact that Prime's managers, hired after 2003, had not been briefed about Prime's work for Loders while their predecessors were in charge does not affect the fact that Prime as an entity knew about the subject (which the new managers eventually brushed up on). A corporation knows what

its managers know, and it does not acquire amnesia when the management team changes. See *Prime Eagle Group Ltd. v. Steel Dynamics, Inc.*, No. 09-1663 (7th Cir. July 27, 2010). By 2007, when Prime bid on the Loders business, its managers were cognizant of the work Prime had done for Loders in 1998 to 2003.

Although Prime first knew in 1998 (if not earlier) about Loders's traffic, it might have been possible for Alliance to argue that it did not know about "such" traffic. The word "such" might carry the weight that Alliance tried to place on "traffic". But Alliance did not contend in the district court, or in its appellate brief, that the word "such" designates an increase or change in traffic during the contract's term. Prime reads "such" as a reference to earlier mentions of "traffic"—legalese for the proposition that "this use of the word 'traffic' refers to the same 'traffic' that this clause already mentioned." That seems to us the most likely meaning of "such" in this clause. See Bryan A. Garner, *A Dictionary of Modern Legal Usage* 849 (2d ed. 1995). The district court therefore should have granted Prime's motion under Rule 50 for judgment as a matter of law.

REVERSED